UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
CARMEN HERRERA,                       :
                                      :        15 Civ. 9286 (JSR)
         Plaintiff,                   :
                                      :
                                      :           OPINION
         -v-                          :         AND ORDER
                                      :
TRABAJAMOS COMMUNITY HEAD START
INC.,

         Defendant.

------------------------------------x

JED S. RAKOFF, U.S.D.J.

        Defendant Trabajamos Community Head Start, Inc.

("Trabajamos") received federal funds under the American

Recovery and Reinvestment Act of 2009 ("ARRA"), the economic

stimulus package enacted early in President Barack Obama's first

term of office. Naomi Herrera-Castro ("Castro"), the former

Executive Director of Trabajamos, claimed that she was fired for

reporting a fraudulent scheme involving stimulus funds, and

brought a one-claim "whistleblower" complaint against the

defendant. Following discovery, Castro died, but her suit was

taken over by her next-of-kin, Carmen Herrera. Trabajamos had

meanwhile moved for summary judgment dismissing the suit. Having

carefully considered the parties' arguments and submissions, the

Court hereby denies the defendant's motion, save for one minor

aspect of the motion that is granted.

"Summary judgment is proper only if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 846 F.3d 58 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). Courts "view the evidence in the light most favorable to the party opposing summary judgment, draw all reasonable inferences in favor of that party, and eschew credibility assessments." Smith v. Barnesandnoble.com, LLC, 839 F.3d 163, 166 (2d Cir. 2016) (alterations omitted).

The pertinent facts, undisputed except where noted, are as follows. Trabajamos is a not-for-profit corporation that provides Head Start programming to low-income children in the Bronx. Defendant Trabajamos Community Head Start, Inc.'s Local Civil Rule 56.1 Statement of Undisputed Facts ("Def. 56.1"), ECF No. 18, ¶ 1; Plaintiff's Counter-Statement of Material Facts ("Pl. 56.1"), ECF No. 21, ¶ 1. Trabajamos receives federal funds administered by the New York City Administration for Children's Services ("ACS"), a Delegate Agency under the federal Head Start Program Performance Standards. Amended Complaint, ECF No. 33, ¶ 9; Defendant Trabajamos Community Head Start, Inc.'s Answer to Plaintiff's Amended Complaint, ECF No. 34, ¶ 9. In September 2012, Trabajamos's Board of Directors consisted of Sandra

Martinez (Chairperson), Donald Antonetty, Stacey Andino (now Stacey Santiago), Paul Block, Vicky Gholson, Nilda Lont, and Monique Van Putten. Def. 56.1 ¶¶ 4, 17; Pl. 56.1 ¶¶ 4, 17. In December 2013, the Board consisted of Martinez (Chairperson), Block, Lont, and Gholson. Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5.

Antonetty, though no longer affiliated with Trabajamos, was a central figure in the organization for many years, having served on the Board for around twenty years, and as Chairman for around ten. Pl. 56.1. ¶¶ 119-20; Defendant Trabajamos Community Head Start, Inc.'s Reply to Plaintiff's Counterstatement of Material Facts ("Reply 56.1"), ECF No. 29, ¶¶ 119-20. He resigned as Chairman at some point in 2012, and resigned from the Board entirely on or about October 3, 2013. Pl. 56.1 ¶¶ 133-35; Reply 56.1 ¶¶ 133-35. The circumstances of his departure are somewhat disputed, but there is evidence that ACS, for which Antonetty also worked, forced him to resign because of a conflict of interest. Pl. 56.1 ¶¶ 132-35; Reply 56.1 ¶¶ 132-35. However, Antonetty continued to play a role in Trabajamos's affairs following his resignation, including advising Board member Nilda Lont on personnel matters (though the extent of his involvement is disputed). Pl. 56.1 ¶ 136; Reply 56.1 ¶ 136. Antonetty also allows Lont, a longtime friend, to live rent-free

in a residence owned by Antonetty. Pl. 56.1 ¶ 128; Reply 56.1
¶ 128.

Castro began working for Trabajamos in January 1986 as a
Records Clerk. Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9. By March 2012, she
had risen to the position of Acting Director of Trabajamos, and
in September of that year, the Board appointed her Program
(Executive) Director. Def. 56.1 ¶¶ 12, 14; Pl. 56.1 ¶¶ 12, 14.
Castro, as Executive Director, was nominally responsible for
managing the day-to-day operations of Trabajamos, Def. 56.1 ¶ 7;
Pl. 56.1 ¶ 7, but the parties dispute the true distribution of
authority within the organization. Trabajamos maintains that
Castro reported to the entire Board, which jointly supervised
Castro and oversaw the organization; according to Castro, she
reported to Antonetty, who exercised complete and unilateral
control over Trabajamos. Def. 56.1 ¶¶ 3, 13; Pl. 56.1 ¶¶ 3, 13,
121-129; Reply 56.1 ¶¶ 121-129.

At some point between May and September 2013, Santiago,
Trabajamos's Fiscal Officer and Castro's niece, brought to
Castro's attention certain invoices and payments Santiago
suspected were fraudulent. Def. 56.1 ¶¶ 17, 99; Pl. 56.1 ¶¶ 17,
99, 137; Reply 56.1 ¶ 137. The precise details of the supposed
fraud are unclear, but there is evidence that Antonetty had
submitted invoices totaling around $9,000 under the names Victor

4

Martinez and Luis Castillo.[1] Def. 56.1 ¶¶ 97-104; Pl. 56.1 ¶¶ 97-104, 138; Reply 56.1 ¶ 138. Castro had approved these invoices for payment when they were submitted, and had known that some of them sought payment for work that had not been performed by the person named in the invoice. Def. 56.1 ¶¶ 100, 102-04; Pl. 56.1 ¶¶ 100, 102-04.

According to Castro, at some point in August or September 2013, she confronted Antonetty about a check made out to Luis Castillo, and he became argumentative and repeatedly told her that he "need[ed] that check." Pl. 56.1 ¶¶ 140-41. At that time, Antonetty was still on the Board of Directors. Santiago testified that she also questioned Antonetty about the Castillo check, and Antonetty told her that he needed the check and that he was not otherwise able to pay himself for the work he did. Pl. 56.1 ¶ 139. Antonetty denies these conversations took place. Reply 56.1 ¶¶ 139-41. Castro took no further action on the fraudulent invoices at that time.

Antonetty resigned from the Board on or about October 3, 2013. Pl. 56.1 ¶ 135; Reply 56.1 ¶ 135. Around the same time, the Board began to report deficiencies in Castro's performance.

---

[1] It appears that Victor Martinez is the teenage son of Board Chairperson Sandra Martinez, and that Luis Castillo is a friend of Antonetty's. See Santiago Deposition, Ex. C to Declaration in Opposition ("Clark Decl."), ECF No. 22, at 84-85.

For example, according to the minutes of an October 3, 2013 Board meeting, Castro's reports were mislabeled and incorrect, and there were security concerns at certain Trabajamos facilities. Def. 56.1 ¶¶ 36-41. Castro was present at this meeting, but denies that the concerns reflected in the minutes were in fact discussed. Pl. 56.1 ¶¶ 36-41.

At some point after the October 3 Board meeting, Antonetty, Lont, and Castro met to discuss Castro's employment with Trabajamos. The circumstances of this meeting are disputed. Castro testified that Antonetty and Lont came to her office after working hours and demanded that she step down as Executive Director; she refused, but eventually agreed to a leave of absence. Def. 56.1 ¶¶ 44-45; Pl. 56.1 ¶¶ 44-45, 147, 149. According to Castro, Antonetty was motivated by his belief that she had disclosed his conflict of interest to ACS, which had forced him to resign from the Trabajamos Board. Pl. 56.1 ¶ 148. For his part, Antonetty testified that Castro arranged the meeting at her house in order to confess her own misconduct (she allegedly had rented a car for personal use with Trabajamos funds) and requested a leave of absence. Def. 56.1 ¶¶ 46-47; Reply 56.1 ¶¶ 147-49.

While all of this remains the subject of competing contentions, it is at least undisputed that after that meeting,

6

Castro sent a letter to the Board requesting a leave of absence, which was granted within a few days. Def. 56.1 ¶¶ 52, 58; Pl. 56.1 ¶¶ 52, 58. According to Trabajamos, while Castro was on leave, Board member Lont discovered other indications of possible misconduct by Castro, including excessive petty cash receipts, payments to Castro's boyfriend Enrique Rivera for maintenance work, and disrespectful conduct toward staff. Castro, however, denies all misconduct and performance issues, claiming in particular that Antonetty had approved the decision to hire Rivera. Def. 56.1 ¶¶ 60-61; Pl. 56.1 ¶¶ 60-61. On November 12, 2013, Martinez sent Castro a letter stating that the Board had extended her leave for an additional two weeks. Def. 56.1 ¶ 62; Pl. 56.1 ¶ 62. On November 18, 2013, Castro requested a meeting with the Board, and Martinez responded that the Board would promptly hold one. Def. 56.1 ¶¶ 63-64; Pl. 56.1 ¶¶ 63-64.

According to Castro, at some point between November 18 and December 5, 2013, Castro had a telephone conversation with Block (another member of the Board) in which Castro told Block that Castro had evidence of fraud at Trabajamos. Pl. 56.1 ¶ 142. There is no other evidence of this call, and no evidence that Castro gave Block any details of the supposed fraud.

On December 2, 2013, the Board met to discuss Castro's performance.[2] Def. 56.1 ¶ 69. According to minutes of that meeting, Trabajamos "reviewed the issues of the Executive Director's performance" and "came to consensus that a decision was needed as to Ms. Castro continuing as the Executive Director and possibly being asked to step down," though no final decision was made. Def. 56.1 ¶¶ 70-71, 73; Ex. 36 to Rotenberg Decl.

Thereafter, on December 5, 2013, the Board (Martinez, Lont, and Block in attendance) held a special meeting with Castro and Santiago. Def. 56.1 ¶¶ 77-78; Pl. 56.1 ¶¶ 77-78. The circumstances of this meeting are disputed, but, in broad strokes, Castro and Santiago testified that Castro presented the fraudulent Victor Martinez and Luis Castillo invoices to the Board, which refused to discuss them, whereas Lont and Block

---

[2] Castro, who was not at the meeting, nonetheless denies that this Board meeting took place, apparently on no better basis than that one of the attendees, Block, did not specifically recall when it occurred. Pl. 56.1 ¶¶ 69-74. But other attendees did and took formal minutes to boot. See Def. 56.1 ¶ 69; Ex. 36 to Declaration of Jeffrey D. Rotenberg in Support of Defendant Trabajamos Community Head Start, Inc.'s Rule 56.1 Statement of Undisputed Facts ("Rotenberg Decl."), ECF No. 20. Moreover, it requires a highly contrived reading of Block's testimony to see any basis for Castro to deny that the meeting took place. The Court will deem such baseless denials as admissions. See Schoolcraft v. City of New York, 103 F. Supp. 3d 465, 476 (S.D.N.Y. 2015) ("Denials without support or explanation are treated as admissions.").

testified that they remembered no such allegations of fraud. Def. 56.1 ¶¶ 77-82, 85; Pl. 56.1 ¶¶ 77-82, 85, 144-46; Reply 56.1 ¶ 144-46; Santiago Deposition, Ex. C to Clark Decl., at 104-05. The Board voted to fire Castro after she left. Def. 56.1 ¶ 84; Pl. 56.1 ¶ 84. According to the minutes of the meeting, Castro was terminated for a number of performance-related reasons, such as her failure to seek Board approval before hiring Santiago (her niece), her failure to seek Board approval of contracts over $5,000, and her failure to provide monthly fiscal reports. Def. 56.1 ¶ 92; Pl. 56.1 ¶ 92; Ex. 5 to Rotenberg Decl. The following day, the Board sent Castro a termination letter signed by Martinez, Lont, and Block. Def. 56.1 ¶¶ 93-95; Pl. 56.1 ¶¶ 93-95.

In or around September 2014, Castro submitted a charge of being the subject of retaliation for whistleblowing to the Office of the Inspector General for the U.S. Department of Health and Human Services, which resolved to take no action on September 2, 2015. Def. 56.1 ¶¶ 112, 115; Pl. 56.1 ¶¶ 112, 115. On November 25, 2015, Castro filed the complaint in the instant action, claiming that Trabajamos had fired her for reporting misconduct. Def. 56.1 ¶ 116; Pl. 56.1 ¶ 116. At the Court's direction, on August 1, 2016, Castro filed an amended complaint that conformed to certain deposition testimony that had departed

from her original complaint in material respects. See Amended
Complaint, ECF No. 33. Castro died on September 11, 2016, after
the instant motion was fully brief and argued, and the Court
entered a stay. See Order dated Sept. 12, 2016, ECF No. 36. On
January 30, 2017, the Court substituted Castro's sister, Carmen
Herrera, as plaintiff, lifted the stay, and turned to deciding
the instant motion. See Order dated Jan. 30, 2017, ECF No. 45.

Few courts have had the occasion to interpret the
retaliation provision of the American Recovery and Reinvestment
Act of 2009, Pub. L. No. 111-5, § 1553, 123 Stat. 115, 297, so
there is little case law directly on point and no binding
judicial authority. However, the ARRA retaliation provision was
not created out of whole cloth, and many of its components have
close (or even identical) counterparts in statutes that courts
have encountered more frequently, such as the Sarbanes-Oxley
Act, see 18 U.S.C. § 1514A, and the Whistleblower Protection
Act, see 5 U.S.C. § 1221. Decisions interpreting these statutes
are persuasive authority on the meaning of ARRA, as, of course,
are the small number of decisions interpreting ARRA.

Two courts have framed the elements of an ARRA retaliation
claim as follows: "(1) that [plaintiff] made a protected
disclosure, (2) that [plaintiff] suffered a reprisal, and (3)
that the protected disclosure was a contributing factor in the

10

reprisal." <u>See</u> <u>Wang v. Wash. Metro. Area Transit Auth.</u>, No. 14-
cv-1189 (RC), _ F. Supp. 3d _, 2016 WL 4007067, at *32 (D.D.C.
July 25, 2016) (alterations omitted); <u>see also</u> <u>Hadley v. Duke</u>
<u>Energy Progress, LLC</u>, _ F. Appx _, 2017 WL 496091, at *1 (4th
Cir. Feb. 7, 2017) (unpublished) (similar). "If a plaintiff
proves the three elements of an ARRA whistleblower claim, the
employer can rebut the claim with clear and convincing evidence
'that the employer would have taken the action constituting the
reprisal in the absence of the disclosure.'" <u>Wang</u>, 2016 WL
4007067, at *32 (quoting ARRA § 1553(c)(1)(B)).

The Court agrees that these elements accurately track the
requirements of the statute, <u>see</u> ARRA § 1553(a), (c), and adopts
them with one slight modification. Using the term "reprisal" in
the second and third elements could potentially lead to
confusion, because it assumes that an adverse employment action
was in fact taken in retaliation for a protected disclosure. If
a whistleblower were fired solely for poor performance, it might
be misleading to characterize the termination as a "reprisal,"
even though a termination would satisfy the requirement that the
employee has been "discharged." <u>See</u> <u>id.</u> § 1553(a). Thus, for the
sake of clarity, in discussing the second and third elements,
the Court will use the specific adverse employment actions set
forth in ARRA, <u>viz.</u>, being "discharged, demoted, or otherwise

discriminated against," see id., rather than the term
"reprisal."

With that framework in mind, Trabajamos concedes that
Castro was "discharged, demoted, or otherwise discriminated
against," but raises several arguments under the first and third
elements, and contends that it has rebutted Castro's claim with
clear and convincing evidence.

ARRA protects disclosures of five distinct types of
misconduct relating to "covered funds." See id. § 1553(a)(1)-
(5). As relevant to this case, an employee makes a protected
disclosure if she reports "information that the employee
reasonably believes is evidence of . . . a gross waste of
covered funds" to the Board of Directors or a supervisor. See
id. § 1553(a)(2). Trabajamos argues, first, that Castro did not
make a protected disclosure because she did not subjectively
believe that the misconduct she reported violated the statute.
But the statute requires no such subjective belief. Rather the
statute requires only that the whistleblower "reasonably
believes" that the information disclosed "is evidence of . . . a
gross waste of covered funds." Id. Moreover, it would thwart
ARRA's purpose – to encourage and protect reports of misconduct
involving covered funds – to require laypeople to form legal

conclusions concerning the misconduct they have discovered before coming within the statute's protection.

Trabajamos's argument to the contrary relies on a flawed analogy of ARRA to the Sarbanes-Oxley Act, whose whistleblower provision has been interpreted to require some level of subjective belief that the employer has broken the law. See Nielsen v. AECOM Tech. Corp., 762 F.3d 214, 221 (2d Cir. 2014) ("[R]elief pursuant to § 1514A turns on the reasonableness of the employee's belief that the conduct violated one of the enumerated provisions . . . ." (emphasis in original)). This argument fails for at least two reasons. First, Sarbanes-Oxley does not require that an employee reasonably believe that the employer violated Sarbanes-Oxley itself, as Trabajamos's analogy requires, but rather that she believe that the employer has violated one of a broad array of other securities and antifraud provisions. Second, that interpretation of Sarbanes-Oxley is based on statutory language that has no counterpart in the relevant portion of ARRA: Sarbanes-Oxley requires that a whistleblower reasonably believe that the reported misconduct constitutes a violation of specific, identified federal laws or SEC regulations, viz. "section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against

13

shareholders." See 18 U.S.C. § 1514A(a)(1). No comparable
language appears in ARRA's gross waste provision. Accordingly, a
plaintiff bringing an ARRA retaliation claim based on gross
waste need not subjectively believe that the reported misconduct
violated the statute.

Trabajamos next argues that Castro did not subjectively
believe that the fraudulent invoices she reported constituted
"gross waste." It is clear from the language of the statute that
the whistleblower must subjectively believe that there was gross
waste and that that belief must be reasonable. See Hadley, 2017
WL 496091, at *1 ("This 'reasonable belief' requires
demonstrating both objective and subjective belief."
(alterations omitted)) (interpreting ARRA).

However, it is clear that there is a genuine dispute of
material fact as to whether Castro subjectively believed that
she was reporting gross waste. As evidence that Castro lacked
this belief, Trabajamos points out that Castro approved certain
invoices despite being aware that they were potentially
fraudulent, and that she waited for several months before
reporting these invoices to the Board. Def. 56.1 ¶¶ 100, 102-04;
Pl. 56.1 ¶¶ 100, 102-04. But viewed most favorably to the
plaintiff, the evidence shows that Castro reported the
fraudulent invoices to Antonetty, whom she characterized as her

14

direct supervisor, within as little as one to two months. Def.
56.1 ¶¶ 99; Pl. 56.1 ¶¶ 99, 137, 140; Reply 56.1 ¶ 137. And even
that modest delay was understandable, given that Antonetty, in
Castro's view, controlled all aspects of Trabajamos and was the
chief culprit in the fraud. See Pl. 56.1 ¶¶ 13, 121-124.
Additionally, there is no real dispute that within a few months
of confronting Antonetty with the fraud, Castro presented her
findings to the Board. Def. 56.1 ¶¶ 77-82; Pl. 56.1 ¶¶ 77-82.
Notwithstanding the slight delay and the fact that Castro
processed some of the invoices, a reasonable jury could conclude
that she believed the fraudulent invoices she reported to
Antonetty and the Board alike represented a gross waste.

A jury could likewise conclude that Castro's belief that
the fraudulent invoices were a gross waste was objectively
reasonable. Trabajamos points out that the dollar value of the
fraudulent invoices was comparatively minor (around $9,000) and
that it is possible that at least some of the invoiced work was
performed, though not by the individuals named in the invoices.
Reply 56.1 ¶ 138; See Castro Deposition, Ex. 6 to Rotenberg
Decl., at 174-75, 363-64, 367-69. However, phrased differently,
Trabajamos concedes that Castro discovered that Trabajamos had,
at times, either paid people for work they never did or paid for
"work" that was never done at all. Def. 56.1 ¶¶ 97, 102-04; Pl.

56.1 ¶¶ 97, 102-04. There is also evidence that some of this
money went directly to Antonetty, the former Chairperson of the
Board and a central figure at Trabajamos even after he stepped
down; some also may have gone to the teenage son of the current
Chairperson, Sandra Martinez. See Def. 56.1 ¶ 97; Pl. 56.1
¶¶ 97, 138-38. This evidence is sufficient for a jury to find
Castro's belief that there was gross waste at Trabajamos
objectively reasonable.

Trabajamos's final argument under the first element is that
Castro's reports of misconduct to individual Board members do
not qualify as protected disclosures. See, e.g., Defendant
Trabajamos Community Head Start, Inc.'s Reply Memorandum of Law
("Def. Reply"), ECF No. 27, at 5 n.4; Transcript dated July 13,
2016, at 22-23. ARRA protects disclosures made to, inter alia,
the Board of Directors or "a person with supervisory authority
over the employee (or such other person working for the employer
who has the authority to investigate, discover, or terminate
misconduct)." ARRA § 1553(a). Trabajamos does not deny that
Castro's report to the full Board on December 5, 2013 falls
within the statute, but argues that Castro's two reports to
individual Board members do not, because Antonetty lacked
supervisory authority over Castro and because there is
insufficient evidence of the report to Block.

16

However, it is clear that there is a genuine dispute of material fact as to whether Antonetty had either "supervisory authority" over Castro or "the authority to investigate, discover, or terminate misconduct" when Castro disclosed misconduct to him in August or September 2013.[3] Trabajamos points to evidence that Castro was, as a formal matter, personally responsible for day-to-day operations, that she reported to the entire Board of Directors, and that Antonetty claims to have had had "as little as possible" involvement in Trabajamos's day-to-day affairs. Def. 56.1 ¶¶ 7, 12-15; Reply 56.1 ¶¶ 121-24. However, viewing the evidence most favorably to Castro, a jury could find that although Castro was nominally the highest ranking Trabajamos officer, Antonetty was her de facto supervisor. Castro repeatedly testified that she reported directly to Antonetty, that all material decisions were subject to his approval, and that they spoke daily about all Trabajamos business. Pl. 56.1 ¶¶ 13, 122-24. That Antonetty continued to be involved in Trabajamos personnel matters even after he resigned

_____

[3] Implicit in Trabajamos's position is an argument that reports to individual Board members do not constitute reports to the entire Board, because otherwise, Castro's report to Antonetty would fall within ARRA's protection even absent any supervisory authority. See ARRA § 1553(a). This argument was not briefed, but the Court will assume it is correct for purposes of this discussion, though there may be good arguments to the contrary.

further suggests that he had the requisite level of authority over Castro while he was still on the Board. For example, in a recorded conversation with Santiago, Antonetty suggested that he was personally involved in the decision to grant her "voluntary" leave of absence, which occurred after his resignation. See Ex. H to Clark Decl. ("Naomi asked for a leave of absence, which was granted. . . . There's no reason that I wouldn't, that we wouldn't grant her a leave of absence."). In light of this conflicting evidence, whether Antonetty had the requisite level of authority over Castro is a question for the jury.

However, Castro has failed to create a genuine dispute of material fact as to whether she made a protected disclosure to Block. There is no evidence that Block controlled the Board (indeed, such evidence as there is on this point suggests he was largely uninterested in Trabajamos affairs, see Pl. 56.1 ¶¶ 130-31; Reply 56.1 ¶¶ 130-31). Nor is there any evidence that Block had any personal supervisory or investigatory authority over Castro at any time. Moreover, at best, the evidence shows that Castro told Block on a single telephone call that she had some unspecified "evidence of fraud and waste," without supplying any details. Pl. 56.1 ¶ 142. Even viewing the evidence most favorably to the plaintiff, this is far too vague to satisfy the requirement that a whistleblower must report "information that

the employee reasonably believes is evidence of . . . a gross
waste of covered funds." ARRA § 1553(a) (emphasis added).

Turning to the third element of Castro's claim, Trabajamos
next argues that Castro failed to show that the protected
disclosures just discussed were a "contributing factor" in the
adverse employment actions taken against her. See ARRA
§ 1553(c)(1)(A)(i) (requiring whistleblowers to "demonstrate[]
that a [protected] disclosure . . . was a contributing factor in
the reprisal"); see also Wang, 2016 WL 4007067, at *32 ("To
recover under ARRA's whistleblower provision, a plaintiff must
prove by a preponderance of the evidence . . . that the
protected disclosure was a contributing factor in the reprisal."
(alterations omitted)).

While the Second Circuit has not construed the term
"contributing factor" in this context, the lower courts agree
that it means "any factor which, alone or in connection with
other factors, tends to affect in any way the outcome of the
decision." See, e.g., Perez v. Progenics Pharm., Inc., 965 F.
Supp. 2d 353, 366 (S.D.N.Y. 2013) (Sarbanes-Oxley); Leshinsky v.
Telvent GIT, S.A., 942 F. Supp. 2d 432, 449 (S.D.N.Y. 2013)
(same). It is also clear that "a whistleblower need not
demonstrate the existence of a retaliatory motive on the part of
the [person(s)] taking the alleged prohibited personnel action

19

in order to establish that [the whistleblower's] disclosure was a contributing factor to the personnel action." Marano v. U.S. Dep't of Justice, 2 F.3d 1137, 1141 (Fed. Cir. 1993) (Whistleblower Protection Act) (emphasis in original). More narrowly, ARRA provides two non-exclusive ways by which a plaintiff may use circumstantial evidence to establish that a protected disclosure was a contributing factor in an employee's discharge, demotion, or other negative employment action: by showing that "the official undertaking the reprisal knew of the disclosure" or that the timing of the employment action reasonably suggests that it was connected to the disclosure. See ARRA § 1553(c)(1)(A)(ii)(I)-(II).

Here, there is no dispute that Castro suffered three distinct negative employment actions. In late October 2013, Castro took a leave of absence, Def. 56.1 ¶¶ 52, 58; Pl. 56.1 ¶¶ 52, 58, and while the parties dispute whether it was voluntary, Trabajamos does not deny that it occurred in a context that falls within the statute's protections. See, e.g., Transcript dated July 13, 2016, at 23. On November 12, 2013, the Board extended Castro's leave of absence under such circumstances. Def. 56.1 ¶ 62; Pl. 56.1 ¶ 62. Finally, and most seriously, the Board fired Castro shortly after the December 5, 2013 Board

meeting at which she presented the evidence of fraud. Def. 56.1 ¶¶ 93-94, 96; Pl. 56.1 ¶¶ 93-94, 96.

Thus, the issues under the contributing factor element are whether her disclosures to Antonetty and the Board were "factor[s] which, alone or in connection with other factors, tend[ed] to affect in any way" the Board's decisions to place her on a leave of absence, extend that leave, or ultimately fire her. Beginning with the disclosure to Antonetty, Trabajamos argues that the disclosure to Antonetty cannot have been a contributing factor in the Board's employment actions against Castro because there is no evidence that the Board was aware of the disclosure.

The Court is not persuaded. As an initial matter, no such evidence is required by the statute; as noted above, ARRA provides that "evidence that the official undertaking the reprisal knew of the disclosure" (here, the Board) is acceptable, but not necessary, evidence.[4] See ARRA §

---

[4] Bechtel v. Administrative Review Board, 710 F.3d 443, 447 & n.5 (2d Cir. 2013), which found that Sarbanes-Oxley requires proof that the employer "knew or suspected" that the whistleblower engaged in protected activity, is not to the contrary, because unlike ARRA, that statute does not provide that knowledge of the official taking the reprisal is permissible evidence that can satisfy the contributing factor element. See ARRA § 1553(c)(1)(A)(ii)(I). The clear implication is that an ARRA claimant may succeed without showing employer knowledge, so long as she adduces otherwise sufficient circumstantial evidence.

1553(c)(1)(A)(ii)(I). More importantly, even though there is no direct evidence that the Board was aware of the disclosure to Antonetty, a jury could readily infer such knowledge from the abundant evidence that Antonetty maintained close personal and professional ties with the Board and was involved in matters directly relating to Castro's employment, even after he formally resigned from Trabajamos in early October 2013.

In particular, it is undisputed that at some point after Antonetty resigned from the Board, he attended the meeting at which he, Lont, and Castro discussed Castro's "voluntary" leave of absence. Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44. Indeed, viewed most favorably to Castro, the evidence shows that Antonetty spoke on behalf of Trabajamos at this meeting and made the decision to grant Castro's leave. See Ex. H to Clark Decl. ("Naomi asked for a leave of absence, which was granted. . . . There's no reason that I wouldn't, that we wouldn't grant her a leave of absence."). Similarly, on November 18, 2013, Lont asked Antonetty for comments on a draft email to Castro concerning the terms of Castro's leave ("do i [sic] need to write more"), and Antonetty directed her to make substantive changes. See Ex. J.

to Clark Decl. ("[A]dd Other than a personal matter you are not to discuss business issues with any Trabajamos staff.").[5]

As for the disclosure to the full Board on December 5, 2013, Trabajamos acknowledges that the suggestive timing is circumstantial evidence in Castro's favor (see ARRA § 1553(c)(1)(A)(ii)(II)) — Castro disclosed the fraud, left the meeting, and was promptly fired — but argues that no inference of causation arises because Trabajamos had resolved to fire her for misconduct beforehand. Trabajamos points out that it is undisputed that Castro had rented a car with a Trabajamos credit card, that she had hired her boyfriend to perform services for Trabajamos, and that the minutes of the December 5 Board meeting cited a number of deficiencies in Castro's performance as bases for firing her. Def. 56.1 ¶¶ 21-23, 25, 47; Pl. 56.1 ¶¶ 21-23, 25, 47; Ex. 5 to Rotenberg Decl.

Whether such alternative causes can, as a matter of law, defeat inferences from temporal proximity on summary judgment is an open question. The fact that ARRA separately provides that a defendant can rebut a plaintiff's case using evidence that the whistleblower would have been fired in any event suggests that

_____

[5] As noted above, Lont lives rent-free in a house owned by Antonetty, who continued to provide guidance to the Trabajamos Board even after Castro was fired. Pl. 56.1 ¶¶ 128-29; Reply 56.1 ¶¶ 128-29.

such matters are not properly part of the contributing factor analysis. See ARRA § 1553(c)(1)(B). However, the Court need not resolve this question. In two recent Sarbanes-Oxley cases, the Second Circuit has assumed, without deciding, that a "legitimate intervening basis" for adverse action can, on summary judgment, defeat an inference from temporal proximity, but both times it found the proffered bases insufficient because they were the subject of materially conflicting evidence. See Yang v. Navigators Grp., _ F. App'x _, 2016 WL 7436485, at *2 (2d Cir. Dec. 22, 2016) (summary order); Sharkey v. JPMorgan Chase & Co., 660 F. App'x 65, 67-68 (2d Cir. 2016) (summary order). That is the case here as well.

In particular, assuming arguendo that Trabajamos's argument is cognizable under the third element of an ARRA claim, the sharply conflicting accounts of the December 5, 2013 meeting preclude summary judgment. As background, the minutes of a Board meeting from December 2, 2013 indicate that the Board was considering asking her to resign, but had reserved a final decision for the coming meeting with Castro. See Def. 56.1 ¶ 69; Ex. 36 to Rotenberg Decl.; see also supra n.2. As for the meeting itself, Castro testified that after she presented the evidence of misconduct, the Board asked her if she was recording the conversation and told her to leave the meeting, which she

24

did. Pl. 56.1 ¶¶ 144, 146; Castro Deposition, Ex. A to Clark
Decl., at 201-03. Santiago, who attended at Castro's request,
testified that the Board avoided discussing the problematic
documents, initially asked Castro to accept a demotion, and
later decided to fire her. Pl. 56.1 ¶ 145; Santiago Deposition,
Ex. C to Clark Decl., at 104-05. Lont vaguely recalled
discussing Martinez's son (in whose name some of the supposedly
fraudulent invoices were made out) and that, at some point,
Castro "stormed out." Reply 56.1 ¶ 146; Lont Deposition, Ex. 10
to Rotenberg Decl., at 59. Block effectively did not recall the
meeting at all, see Block Deposition, Ex. 9 to Rotenberg Decl.,
at 38-39, and Martinez, the third Board member present, was not
deposed in this case. Notwithstanding Trabajamos's pre-meeting
probe into Castro's misconduct, a jury could credit Castro's and
Santiago's testimony and find that Castro's disclosure of
misconduct "tend[ed] to affect in any way" the decision to fire
her.

Trabajamos's previous argument fits better under the
section of ARRA providing that an employer may rebut the
plaintiff's case with "clear and convincing evidence that the
non-Federal employer would have taken the action constituting
the reprisal in the absence of the disclosure." See ARRA §
1553(c)(1)((B); see also Yang, 2016 WL 7436485, at *1 ("If a

plaintiff carries the burden, the defendant employer can still secure a favorable judgment by showing no genuine dispute that the record clearly and convincingly demonstrates that the employer's adverse action would have been taken even in the absence of protected activity.") (Sarbanes-Oxley). However, for much the same reasons that Trabajamos is not entitled to summary judgment on the contributing factor element, it is not entitled to summary judgment under this more demanding standard. Particularly fatal to Trabajamos's argument is the fact that the Board appears to have first taken an interest in Castro's poor performance and misconduct – the purported basis for her termination - <u>after</u> Castro had reported the fraudulent invoices to Antonetty. <u>See</u> Pl. 56.1 ¶¶ 140-41 (Castro reported to Antonetty in August or September 2013); Def. 56.1 ¶¶ 36-37 (minutes from an October 3, 2013 Board meeting discussing deficiencies in Castro's performance). Thus, even if the Board's investigation (which was chiefly run by Lont, Antonetty's close friend, associate, and rent-free tenant, <u>see</u> Def. 56.1 ¶ 59; Pl. 56.1 ¶ 59) uncovered real misconduct, the record is equally consistent with Trabajamos searching for seemingly legitimate reasons to fire Castro in part because she had disclosed misconduct to Antonetty. Thus, at a minimum, Trabajamos has

failed to show with clear and convincing evidence that it would have fired Castro regardless of her disclosures.

Finally, Trabajamos repeatedly points out that much of the evidence in Castro's favor is her own largely uncorroborated testimony, and that Castro has given shifting accounts of some key events. E.g., Def. Reply at 6-7; Transcript dated July 13, 2016, at 27-28. For example, Castro initially claimed that she had reported misconduct on only one occasion - to the Trabajamos Board on December 5, 2013 - and it was not until her deposition that she added that she also disclosed to Antonetty and Block in the months before that meeting. See Transcript dated July 13, 2016, at 9-18. The suggestion seems to be that Castro's testimony should be discounted, in whole or in part, thus clearing the way for summary judgment to Trabajamos.

This argument is meritless. Castro's testimony is admissible evidence that cannot be disregarded on a motion for summary judgment merely because it conflicts with other portions of the record. See Yang, 2016 WL 7436485, at *1 ("Yang's own testimony as to the communications at issue constituted admissible evidence and, thus, should not have been excluded from consideration in reviewing defendant's summary judgment motion."). The factual disputes Trabajamos identifies are classic jury fodder. Moreover, it is well-established that,

27

except in the most extreme circumstances, courts "eschew credibility assessments" on a motion for summary judgment. See Smith, 839 F.3d at 166. Castro filed an amended complaint conforming to her deposition testimony; a jury is now required to evaluate the credibility of her claim.

Thus, in sum, with the one exception noted below, Trabajamos's motion for summary judgment is hereby denied. There are genuine issues of material fact as to (i) whether Castro made protected disclosures to Antonetty in August or September 2013 and to the Board on December 5, 2013; (ii) whether she made those disclosures with the objectively reasonable belief that the fraudulent invoices represented a gross waste of covered funds; (iii) whether those disclosures were a contributing factor in Trabajamos's decisions to place Castro on leave, extend the leave, and fire her; and (iv) whether there is clear and convincing evidence that Trabajamos would have fired Castro even if she had not reported the misconduct. However, Trabajamos's motion is granted to the limited extent that it argues that Castro's telephone call to Block does not qualify as a protected disclosure.

The parties are directed to jointly call Chambers by no later than February 24, 2017 to schedule a trial in this case. The Clerk of Court is directed to close docket entry 17.

28

SO ORDERED.

Dated:    New York, NY
          February 20 2017          JED S. RAKOFF, U.S.D.J.